**WEIR & PARTNERS LLP**
Marc J. Zucker, Esquire (MZ 7768)
Susan Verbonitz, Esquire (SV 2487)
The Liberty View Building
Suite 310
457 Haddonfield Road
Cherry Hill, NJ 08002
Tel: (856) 740-1490
Fax: (856) 740-1491
Attorneys for Plaintiff

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| NORVERGENCE, INC., | : | Case No. 04-32079 (RG) |
| Debtor, | : | |
| | : | |
| The Townsend Corporation, f/k/a | : | |
| Townsend Tree Service Co., Inc. | : | Adversary No. |
| 101 S. Main Street | : | |
| Parker City, IN 47368 | : | |
| Plaintiff, | : | |
| v. | : | |
| Norvergence, Inc., Debtor | : | |
| and | : | |
| Preferred Capital, Inc. | : | |
| a corporation in receivership | : | |
| c/o Kathryn A. Belfance, Receiver, | : | |
| One Cascade Plaza, Suite 2100 | : | |
| Akron, OH  44308-1108 | : | |
| and | : | |
| American National Bank | : | |
| c/o U.S. Bank, servicer to American | : | |
| National Bank | : | |
| 1310 Madrid Street, Suite 103 | : | |
| Marshall, MN   56258 | : | |
| Defendants. | : | |
| | : | |

**ADVERSARY COMPLAINT**

Plaintiff, by and through its undersigned counsel, files this Adversary Complaint

seeking a declaratory judgment pursuant to 28 U.S.C. §§2201, et seq. and Federal Rules

of Bankruptcy Procedure ("Bankruptcy Rule") 7001(9), equitable relief and damages

pursuant to N.J.S.A. 56:8-1 et seq., N.J.S.A. 12A:2A-101, and N.J.S.A. 2A:32-1 and

common law, and seeking equitable subordination or disallowance of any and all claims

filed or asserted by the non-debtor defendant(s) in this bankruptcy case ("Norvergence

Case") pursuant to 11 U.S.C. §§502(b) and 510(c) and asserting plaintiff's unsecured

claims for damages caused by Norvergence in concert with the non-debtor defendants

pursuant to 11 U.S.C. §§501 & 502, and in support thereof say as follows:

## I. PARTIES

1.      Plaintiff The Townsend Corporation is an Indiana corporation engaging in

business at the address indicated above ("Townsend").   Townsend was formerly known

as Townsend Tree Service Co., Inc.

2.      Defendant Norvergence, Inc., debtor in the Norvergence Case,

("Norvergence") is a New Jersey corporation, incorporated in 2001, which maintained a

place of business at 550 Broad St, Newark, NJ.

3.      Defendant Preferred Capital Inc. ("Preferred Capital") is an Ohio business

organization in receivership. By order dated April 14, 2005, the Summit County Court of

Common Pleas, Akron, Ohio, appointed Kathryn A. Belfance, One Cascade Plaza, Suite

2100, Akron, OH  44308-1108, as the receiver.

4.      Preferred Capital purports to be the assignee of certain documents entitled

Equipment Rental Agreements ("ERAs"), each of which was purportedly entered into by

Norvergence with Townsend.

5.      Defendant American National Bank ("American National") is believed to be a bank chartered in the state of Ohio, doing business through its servicer, U.S. Bank, at the address averred above.

6.      It is believed and therefore averred that as of March 30, 2005, with knowledge of the Norvergence bankruptcy and the circumstances under which the ERAs were procured, American National purchased Preferred Capital's interest in Townsend's ERA, and American National purported to become an assignee thereof.

7.      Preferred Capital and American National shall be referred to collectively as Defendants.

## II.      JURISDICTION, VENUE AND CHOICE OF LAW

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§157, 1331 and 1334.

9.      Venue is appropriate in this Court pursuant to 28 U.S.C. §1409 and 18 U.S.C. §1964.

10.     This proceeding arises in or is related to a case arising under Title 11 of the Bankruptcy Code pursuant to 28 U.S.C. §157(a).

11.     The applicable statutory bases for the causes asserted herein, include but are not limited to 11 U.S.C. §§105, 502, and 510, and N.J.S.A. 56:8-1 et seq.

12.     New Jersey law governs the construction and enforcement of the ERAs. Townsend's ERA contained the following provision:

> This Agreement shall be governed by, construed and enforced in accordance with the Laws of the state in which Rentor's principal offices are located, or if this Lease is assigned by Rentor, the State in which the assignee's principal offices are located, without regard to such State's choice of law considerations and all legal actions relating to this Lease shall be venued exclusively in a state

or federal court located within that State, such court to be chosen at Rentor or Rentor's assignee's sole option.

13.     The ERA provides that in the event a guarantee is executed, the choice of law and venue provisions governing the guarantees follow the same scheme.

14.     The ERA defines and identifies the "Rentor" as Norvergence, which, as noted above, maintained its principal place of business at 550 Broad Street, Newark, Essex County, New Jersey.

15.     The ERA defines and identifies the "Renter" to be Townsend.

16.     The ERA provides neither the identity nor address of any "Assignee."

17.     The ERA was formed under New Jersey law, and New Jersey is the only certain and appropriate source of law for governing, enforcing, and construing the ERA.

18.     The ERAs were contemporaneously entered into with the telecommunication service agreements between Norvergence, on the one hand, and Townsend on the other.  They provide, at paragraph 12, that New Jersey law governs the construction and interpretation of the agreement.

19.     New Jersey law governs the claims asserted in this action, including but not limited to the construction and enforcement of the ERAs. Townsend entered into the standard form of ERA (attached hereto as Exhibit "1"), with Norvergence identified as the "Rentor," and containing the following provision:

> This Agreement shall be governed by, construed and enforced in accordance with the Laws of the State in which Rentor's principal offices are located, or if this Lease is assigned by Rentor, the State in which the assignee's principal offices are located, without regard to such State's choice of law considerations and all legal actions relating to this Lease shall be venued exclusively in a state or federal court located within that State, such court to be chosen at Rentor or Rentor's assignee's sole option.

20.    The ERA provides that in the event a guarantee is executed, the choice of law and venue provisions governing the guarantees follow the same scheme.

21.    The ERA defines and identifies the "Rentor" as Norvergence, which maintained its principal place of business at 550 Broad Street, Newark, Essex County, New Jersey.

22.    The ERA defines and identifies the "Renter" to be Townsend.

23.    The ERA provides neither the identity nor address of any "Assignee."

24.    Moreover:

    a.    the acts and omissions of Norvergence, alleged below, were committed by employees based in New Jersey, trained in New Jersey and supervised by others in New Jersey;

    b.    Norvergence was incorporated in New Jersey;

    c.    the unconscionable acts and communications alleged herein originated in New Jersey;

    d.    the Plaintiff received those communications from Norvergence by telephone, fax and/or email originating from New Jersey;

    e.    the ERAs and related documents were written and printed in New Jersey;

    f.    the ERAs and related documents were signed by Norvergence in New Jersey;

    g.    the marketing materials utilized by Norvergence in furtherance of the misconduct alleged herein were written in and disseminated from New Jersey;

h. the ERAs and related documents were transmitted by Norvergence from New Jersey;

i. the ERAs and related documents were accepted by Norvergence in New Jersey;

j. any and all payments made to Norvergence by the Plaintiff were transmitted to and received in New Jersey;

k. any and all assignment documents by which Norvergence assigned its rights to the ERAs and related documents were signed by Norvergence in New Jersey;

l. The ERA was intended to be governed by New Jersey law; and

m. New Jersey is the only certain and appropriate source of law for governing, enforcing, and construing the ERA.

25.    The ERA was contemporaneously entered into with the telecommunication service agreement between Norvergence and the Plaintiff.  As described in detail below, the telecommunication services agreement and the ERA were a bundled, integrated offering, which was an integral part of the scheme, similar to a "Ponzi" scheme, perpetrated by Norvergence, from the inception of its business operations, all of which actions were conducted by Norvergence from New Jersey.

26.    Given the volume of cases and the need for consistent resolution of the issues involved, the potential for inconsistent results if the claims are the subject of individual suits, and the administration of the Norvergence Case, equity and judicial economy mandate: (a) that all claims be presented to a single court, and this Court is the only appropriate court for that purpose; and (b) that all claims be governed by a single

state's law to the extent that state law applies, and New Jersey is the appropriate body of law for that purpose.

27.     As described in detail below, the telecommunication services agreement and the ERA were a bundled, integrated offering, which was an integral part of the fraudulent scheme, similar to a "Ponzi" scheme, perpetrated by Norvergence, from the inception of its business operations.

### III.     FACTUAL BACKGROUND

### A.     THE PONZI SCHEME

28.     Norvergence held itself out as a provider of "low-cost" telecommunication services to small and medium size businesses throughout the United States.

29.     Norvergence purported to offer deeply discounted telecommunication services to prospective business customers, but required that its prospective customers also enter into ERAs in order to avail themselves of those services.

30.     Townsend entered into an agreement with Norvergence for the provision of telecommunication services, and also simultaneously entered into an ERA with Norvergence for what was purported to be a "rental" of certain hardware and software which the ERA referred to as a "MATRIX™" device.

31.     Norvergence represented that it charged its customer a flat monthly fee for unlimited long distance, unlimited Internet, and unlimited cellular calling, and provided each customer with an unlimited number of cell phones.

32.     Prior to being permitted to obtain the services and discounts promised by Norvergence, Norvergence required Townsend to make application to Norvergence and to submit its existing telecommunications bills to Norvergence.

33.    Norvergence used the telecommunications bills provided by Townsend to propose to Townsend the cost for Norvergence's flat rate service and to calculate the monthly fee for the ERA, as set forth more fully below.

34.    Norvergence, through its advertising, marketing and form letters sent to each prospective customer, engaged in high pressure, misleading, and deceptive sales tactics that resulted in significant confusion and misunderstanding by Townsend with respect to the nature of the services actually purchased from Norvergence and the distinction between the Norvergence agreement for telecommunication services and the ERA.

35.    Norvergence represented that only the most qualified applicants would be accepted as Norvergence customers because of the extremely high demand for the Norvergence system.

36.    Norvergence refused to negotiate any of the terms of either the ERA or the Norvergence telecommunication services agreement.

37.    Norvergence represented that it was able to offer such deeply discounted telecommunication services because of the engineering technology associated with the Matrix Devices.

38.    Norvergence represented that the engineering "advances" associated with the Matrix Devices allowed for "free unlimited calling circuitry" and the "voice as fast as data" solution, which permitted the elimination of per-minute telecommunication charges.

39.    Upon information and belief, Norvergence entered into an agreement with Qwest Communications Corporation ("Qwest") to utilize Qwest's network for routing

Norvergence customer's telephone and data traffic. Upon information and belief, Qwest

billed Norvergence for telecommunication services on a flat rate basis.

40.    Upon information and belief, Norvergence entered into agreements with

Sprint Communications Company, L.P. ("Sprint") and T-Mobile USA, Inc. ("T-Mobile")

for the provision of cellular telephone service to Norvergence customers. These cellular

providers billed Norvergence on a per minute basis.

41.    Norvergence's sales and marketing efforts increased dramatically in late

2003 and continued through June 2004.

42.    As a result of Norvergence's sales and marketing efforts, ever-increasing

numbers of businesses were induced to sign the telecommunication services agreements

and the ERAs, which resulted in increased demand for service upon the

telecommunication vendors, Qwest, Sprint, and T-Mobile.

43.    While the Norvergence scheme to induce companies like Townsend to

sign telecommunication service agreements and ERAs grew, not only did Norvergence's

anticipated revenue increase, but the demand for the use of telecommunication services

expanded exponentially.

44.    As Norvergence continued to acquire new customers, the cost associated

with the demand for the use of telecommunication services grew but the massive amounts

of cash being generated by the sales of ERAs disappeared.

45.    Ultimately, Norvergence enrolled approximately 10,000 non-profit,

charitable, governmental and small business customers.

46.    On June 30, 2004, an involuntary petition under Chapter 11 of Title 11 of

the United States Code (the "Bankruptcy Code") was filed against Norvergence in the

United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").

At a hearing on July 14, 2004, Norvergence voluntarily converted the Norvergence Case

to a Chapter 7 liquidation, and a Trustee was appointed.

## B.    THE MATRIX DEVICE

47.    Norvergence utilized two different types of Matrix Devices referred to

respectively as the Matrix 850 and the Matrix Soho (jointly herein the "Matrix Devices").

48.    The Matrix 850 simply served as an interface, or simple plug-in

mechanism, between a customer's telephone and computer system and a

telecommunications service provider's T-1 line.  This type of device is quite commonly

used throughout the telecommunication industry and is referred to as an integrated access

device, or IAD.

49.    Norvergence purchased the Matrix 850 devices for approximately

$1,500.00 per unit from the manufacturer of the device.

50.    The Matrix Soho is in actuality a "firewall" device that was connected

between a customer's computer and a modem connected to a DSL internet line in the

customers' building.  The Matrix Soho device is not physically connected in any way

whatsoever with the customer's telephone system or service.  Norvergence simply

directed the local telephone system providers to internally re-route long distance calls of

customers with a Matrix Soho device through Qwest's network.  The Matrix Soho was

used for smaller customers.

51.    Norvergence purchased the Matrix Soho devices for approximately

$345.00 per unit from the manufacturer of the device.

52.    The manufacturer of the Matrix Devices is Adtran, Inc., a Delaware corporation with a principal place of business in Huntsville, Alabama.   The purchase agreement dated February 1, 2003, as amended, by and between Norvergence, and Adtran, Inc., provides that Norvergence may only sell the Adtran products as part of a bundled service offering, and not as a stand alone product offering.

53.    Norvergence required that Townsend enter into the ERA for sixty-month terms.

54.    The aggregate of the sixty monthly payments as provided in the ERAs for the Matrix 850 device ranged from approximately $20,000.00 to as much as $180,000.00 per Matrix device, even though the cost of the Matrix 850 was only $1500.00 per device.

55.    The aggregate of the sixty monthly payments as provided in the ERAs for the Matrix Soho ranged approximately from $12,000.00 to $30,000.00 per Matrix device, even though the cost of the Matrix Soho was only $345 per device.

56.    The wide range in monthly charges for the Matrix Devices generally corresponds to the difference between the historical cost of telecommunication services incurred by Townsend as revealed in the telecommunication bills they submitted as part of the Norvergence application process, and the flat fee actually charged by Norvergence for the "free unlimited" telecommunication services.

57.    In reality, there was no technological relationship whatsoever between Norvergence's offer of "free unlimited" telecommunication services and the Matrix Devices.

58.    The Matrix Devices were not designed to perform, and did not perform, the functions that Norvergence represented that they would perform.

59.     To the contrary, to the extent that the Matrix Devices served any function whatsoever, they merely served as a common integrated access device for Townsend's Internet and telephone service.

60.     Norvergence failed to deliver the services promised to Townsend in the relevant time period.

61.     Townsend received little or no service in connection with its Norvergence service agreement, and suffered from repeated interruptions of its telecommunications services.

**C.    THE ERA DRIVES THE PONZI SCHEME**

62.     Norvergence required that all of its customers enter into the ERA as an integral part of every sale of Norvergence's telecommunication services.  The ERA was a part of the package of documents thrust at Townsend to execute in order to obtain the "reduced rate telecommunication services."

63.     The ERA purports to be an agreement for the rental of a certain Matrix Device, for a term of sixty months.

64.     In reality, the ERA is nothing more than a mechanism whereby Norvergence fraudulently captured advance payments for telecommunication services that it never intended to provide.

65.     The ERA was bundled and integrated with the provision of service by Norvergence.

66.     By its terms, a default by a Renter under the ERA was also a default under the service agreement, but a default by Norvergence under the service agreements allegedly was not a default under the ERA.

67.    The ERA is a two-sided form, with the terms and conditions printed on the reverse side in extremely small print.

68.    The ERA provides that the "Rentor" (Norvergence, in the vast majority of cases), is the owner of and has title to the Matrix device.

69.    The ERA provides that Norvergence may sell, assign or transfer all or part of the ERA and/or the equipment without notifying the Renter, in which case the new owner will have all of Norvergence's rights, but none of its obligations.

70.    The ERA provides that the Rentor and the Renter agree that if Article 2A of the UCC is deemed to apply to the ERA, then the ERA is to be considered a finance lease thereunder, and the Renter waives all rights and remedies provided under Article 2A.

71.    The ERA further provides that:

> You agree to keep the Equipment insured against all risks of loss in an amount at least equal to the replacement cost until this Rental is paid in full.

72.    Defendants required Townsend to pay for insurance each month based not on the replacement value of the Matrix Device but on the total amount of the monthly payments to be made over the term of the ERA.

73.    The ERA further provides –

> If (a) a default occurs, … you will immediately return the Equipment to any location(s) and aboard any carrier(s) we may designate in the continental United States... You will continue to pay Rental Payments until the Equipment is received and accepted by us.

74.    Shortly after the Bankruptcy Court granted the applications of telecommunications service providers Qwest, Sprint and T-Mobile to terminate service

on July 14, 2004, all telecommunication services to Townsend ceased, and Norvergence was thereafter in default of the telecommunication services agreements.

**D.    DEFENDANTS' PARTICIPATION**

75.    At various times throughout the course of Norvergence's fraudulent scheme, a number of leasing and finance companies, including Preferred Capital, entered into agreements with Norvergence.   These agreements provided for the sale and/or assignment of all of Norvergence's right, title, and interest in the ERAs entered into by and between Norvergence and the customers of Norvergence, including Townsend, to Preferred Capital.

76.    These agreements between Norvergence and Preferred Capital provided for Preferred Capital's opportunity to review applications submitted by certain prospective customers of Norvergence, including Townsend.

77.    Preferred Capital participated with and cooperated with Norvergence in the review and underwriting of prospective customers' applications, including Townsend.

78.    Upon information and belief, Preferred Capital established standards for acceptance of prospective customers' applications, in concert and in cooperation with Norvergence.

79.    Upon information and belief, Preferred Capital eliminated or curtailed its own established credit analysis and underwriting procedures so as to allow Preferred Capital to enter into this cooperative relationship with Norvergence.

80.    Preferred Capital held itself out as having expertise in the field of telecommunication equipment leasing or equipment leasing in general.   Contrary to the standard practice of the trade, however, Preferred Capital purchased the ERAs and the

Matrix Devices it covered without any regard whatsoever for the actual or replacement value of the Matrix Devices which were being purchased.

81.   Preferred Capital worked in close cooperation with Norvergence to maximize profits for itself and for Norvergence at the unfair expense of Townsend.

82.   As a result of Preferred Capital's actions, taken in concert with Norvergence, many of the ERAs were assigned to and/or purchased by Preferred Capital from Norvergence simultaneously, or very nearly thereto, with the acceptance of the ERAs by Norvergence.

83.   Pursuant to the various agreements between Norvergence and Preferred Capital, it purchased and/or took an assignment of all of Norvergence's right, title, and interest in and to the associated ERAs and the Matrix Devices associated with each such ERA.

84.   Preferred Capital, in consideration for the assignment or purchase addressed above, purportedly paid to Norvergence approximately 60% of the value of the aggregate payment stream associated with each ERA ("Discounted Payment"). Thus, for example, in the event that a particular ERA was to provide for the payment by the customer of $100,000.00 over the 60 month term of the ERA, then Preferred Capital would pay $60,000.00 to Norvergence as a Discounted Payment.

85.   At a time when the published Prime Rate charged by banks on loans to commercial customers hovered at or near 4% per annum, Preferred Capital would be earning almost 20% per annum on the ERAs, notwithstanding the fact that only the customers with the best credit were eligible to rent the Matrix Devices and to obtain the Norvergence telecommunication services.

86.     Preferred Capital then commenced administration and collection of payments under the ERA directly from the Norvergence customers, including Townsend.

87.     The assignment to Preferred Capital was not revealed to Townsend until after the ERAs were accepted by Townsend.  Townsend was first advised as to the assignment to American National in 2005, long after the commencement of the Norvergence Case.  (See Exhibit 2 hereto.)

88.     Preferred Capital's payment of the Discounted Payment to Norvergence in this fashion enabled and permitted Norvergence to continue to carry out its fraudulent scheme and to further its misrepresentations to additional prospective customers.

89.     Norvergence sold or assigned the ERAs to Preferred Capital which does business in Ohio, despite the availability of other finance companies whose principal places of business are in close proximity to Plaintiff.

90.     Because of this scheme, and subsequent assignments without Plaintiff's consent, Townsend was faced with suit or the threat of suit by Defendants in a remote forum, causing Townsend to incur substantial expenses and inconvenience.

## E.      THE SCHEME COMES TO AN END

91.     Norvergence was selling its telecommunication services at a loss.  In fact, since it incurred a loss with each transaction, as with any Ponzi Scheme, it used some of the cash it acquired from the prior sale of ERAs to Defendants and the other finance companies to fund its ever-growing costs of providing telecommunication services through Qwest, Sprint, T-Mobile, and others, and to further the scheme.

92.     Ultimately, Norvergence was unable to sell enough ERAs to Defendants and the other finance companies to meet the ever increasing demands for payment from Qwest, T-Mobile, and Sprint, for the telecommunications charges these vendors were assessing against Norvergence.

93.     Charges assessed by these three vendors totaled approximately $2,000,000.00 per week by July 2004. While the scheme continued to generate large sums of cash, Norvergence stopped paying its employees (whose payroll checks bounced and whose benefits plans went unfunded), and its other trade creditors.

94.     As a result, for an extended period which ended on June 30, 2004, when an involuntary petition under Chapter 11 of the Bankruptcy Code was filed against Norvergence, Norvergence continued to sell its services and assign the ERAs in order to obtain cash from Defendants and/or other finance companies who continued to purchase the ERAs, but did not pay its bills. That cash has "disappeared."

95.     At a hearing held on July 14, 2004, the Bankruptcy Court entered an order converting the Norvergence Case from an involuntary Chapter 11 proceeding to a voluntary Chapter 7 liquidation. A trustee was appointed that day.

96.     At the same time, the Bankruptcy Court entered an order authorizing Qwest Communications to terminate its T1 service to Norvergence's approximately 10,000 customers.

97.     At the same time, the Bankruptcy Court entered an order authorizing Sprint and T-Mobile to terminate cellular telephone service to Norvergence's approximately 10,000 customers.

98.     Norvergence effectively ceased all operations at or about that time.

99.     Townsend effectively ceased to receive any services from Norvergence at or about that time.

100.    Townsend effectively ceased to receive the benefit of their transactions with Norvergence at or about that time.

101.    Unfortunately, Townsend made initial, and thereafter monthly, payments to Norvergence and/or Defendants on the ERAs, not realizing that they had been victims of a fraud and then out of fear that, despite the fraud, they would be subject to suit.

102.    Qwest terminated its T1 service to all Norvergence customers within days of the Bankruptcy Court's conversion order, thereby disconnecting all long distance telephone and Internet service to Townsend.

103.    Townsend was forced to try to obtain alternate sources for their telecommunication services at substantial cost and expense.

104.    Since Norvergence ceased operations, the Matrix Devices were of no use whatsoever to Townsend, because their substitute carriers required the use of their own equipment, and no substitute carriers were offering any "comparable" services utilizing the Matrix Devices.

105.    Since Norvergence ceased operations, Townsend desired to stop making payments under the ERAs to the Defendants, which would reduce Townsend's claims against the Norvergence Estate.

106.    It is clear that Norvergence was engaged in a fraudulent scheme to generate cash by converting its promise to provide reduced rate telecommunication services into Discounted Payments from Defendants for the long term rental of a Matrix

Device pursuant to the ERAs, and that Norvergence never intended to nor could it provide the promised telecommunication services.

107.    As a result, every Norvergence service agreement and every ERA was fraudulently entered into by Norvergence, which was at all times intent upon operating its Ponzi scheme. That fraud likewise permeates every telecommunications service agreement, which incorporates each ERA, from inception forward.

108.    Defendants continued to purchase the rapidly increasing volume of ERAs in order to obtain the very high rates of return generated by the steep discount at which the ERAs were sold by Norvergence, notwithstanding the increased frequency of customer complaints it was receiving from defrauded Norvergence customers that the Matrix Devices were not being installed and that the promised telecommunication services were not being provided.

109.    Nevertheless, Plaintiff was threatened with suit by one or more of the Defendants for the full amounts claimed to be due under the ERAs, without regard to the fraudulent origins of the ERAs and the total lack of telecommunication services from Norvergence.

110.    In the face of the threat or actual commencement of litigation by Defendants, Townsend continued to make payments to Defendants.

## COUNT I

### Declaratory Judgment

111.    Townsend incorporates by reference the preceding paragraphs as if same were set forth at length herein.

112.    The ERA does not, in actuality, document or evidence the rental or lease of the Matrix Device.

113.    There is no connection whatsoever between the actual cost of the Matrix Device and the charge reflected in the ERAs.

114.    In fact, the total amounts required to be paid under the ERAs frequently exceed one hundred times the price of the associated Matrix Device.

115.    The ERA actually serves as a mechanism whereby Norvergence fraudulently induced Townsend to finance the cost of their telecommunication services that Norvergence had no present intention of providing, and does not evidence a bona fide rental, lease or sale of equipment.

116.    The ERA does not evidence a bona fide lease or rental of equipment, but rather, evidences a contract for prepaid telecommunication services entered by Norvergence for the express purpose of obtaining Discounted Payments from their sale to Preferred Capital.

117.    Defendants held themselves out as lessors or financers of equipment lease transactions in the normal course of business.

118.    Defendants knew or should have known that the "leased" Matrix Device which was the subject of the "lease" evidenced by each and every ERA had a value wholly unrelated to and substantially less than the value of the stream of rental payments required to be paid by Plaintiff under the ERA.

119.    Defendants relied upon the unfair, unconscionable and unenforceable venue provision in the ERA as well as the appearance that the ERA was a valid and enforceable Article 2A finance lease, which purportedly permit them to bring or threaten

to bring a collection suit in far distant jurisdictions, when they purchased the ERAs, so as to unfairly, improperly and economically inhibit the ability of Plaintiff to mount valid defenses to such collection suits.

120.    As Norvergence knew at the time it entered into each transaction that it could not and, in fact, had no present intention of fulfilling the terms of the telecommunication service agreement and related ERAs, Norvergence was engaged in actual fraud when it entered into each and every transaction.

121.    Preferred Capital fueled Norvergence's Ponzi scheme with the Discounted Payments, and enabled Norvergence to commit this fraud, through its purchase of what purported to be the equivalent of UCC Article 2A finance leases that it knew contained unfair, unconscionable and deceptive provisions, so as to cut off the otherwise valid claims and defenses of the Townsend.

WHEREFORE, Townsend respectfully requests that the Court:

a.    enter judgment in its favor on this Count;

b.    declare the ERAs to be void from inception and rescinded;

c.    award to Townsend and against American National and Norvergence the costs of prosecuting this action, including counsel fees, and

d.    award such other and further relief as the Court deems just.

## COUNT II

### Declaratory Judgment – New Jersey Uniform Commercial Code

122.    Townsend incorporates by reference the preceding paragraphs as if same were set forth at length herein.

123. The ERAs do not qualify as "leases" under New Jersey's Uniform Commercial Code.

124. The provision of the Matrix Device by Norvergence to Townsend does not qualify as a "finance lease" under Section 12A:2A-101, et seq., of New Jersey's Uniform Commercial Code.

125. The ERA is unconscionable under Section 12A:2A-101, et seq., of New Jersey's Uniform Commercial Code.

126. The ERA is void because it is a contract of adhesion that unconscionably divorces the duty to provide telecommunication services from the obligation to pay for the Matrix Device under the ERA.

127. Defendants are not holders in due course and are subject to all claims and defenses that Townsend might have had as against Norvergence.

128. The ERA is otherwise void because it is usurious.

129. The ERA is void because it violates the provisions of New Jersey's Uniform Commercial Code.

WHEREFORE, Townsend respectfully requests that the Court:

a. enter judgment in its favor on this Count;

b. declare the ERAs together with Townsend's associated guarantees to be void from inception and rescinded;

c. award to Townsend and against American National and Norvergence the costs of prosecuting this action, including counsel fees, and

d. award such other and further relief as the Court deems just.

## COUNT III

## Conversion

130.    Townsend incorporates by reference the preceding paragraphs as if same were set forth at length herein.

131.    Because Norvergence and the Defendants knew or should have known about, participated in and were the means and instrumentality for the commission of the Ponzi scheme as detailed above and have not provided Townsend with the services or technology as represented and contracted for, and Townsend has paid and continues to pay for such technology, Defendants and Norvergence are unlawfully in possession of property to which Townsend has legal and possessory rights.

132.    Defendants and Norvergence have unlawfully taken money due and owing Townsend and converted such money for their own use.

133.    Defendants and Norvergence, intentionally and without lawful justification, continue to interfere with Townsend's right of possession in their funds.

134.    The foregoing actions in depriving Townsend's right of ownership in the funds and possessing and retaining said funds without Townsend's consent have caused damages to Townsend.

WHEREFORE, Townsend respectfully requests that the Court:

a.    enter judgment in their favor on this Count;

b.    award to Townsend and against American National and Norvergence damages plus interest from the date of the first payment made on each ERA ;

c.    award to Townsend and against American National and Norvergence the costs of prosecuting this action, including counsel fees;

d.    award to Townsend and against American National and Norvergence the costs of defending any action brought to enforce the ERA, including counsel fees; and

e.    award Townsend punitive damages as against Norvergence; and

f.    award to Townsend and against the Defendants such other equitable relief as deemed appropriate by the Court.

### COUNT IV

### Fraud Under the New Jersey Consumer Fraud Act

135.    Townsend incorporates by reference the preceding paragraphs as if same were set forth at length herein.

136.    Norvergence falsely promoted the use of the Matrix Devices as technological advances necessary to provide the services represented by Norvergence in its published materials.

137.    In reality, there is no technological relationship whatsoever between Norvergence's offer of "free unlimited" telecommunication services and the Matrix Devices.

138.    The total amount of the monthly payments as provided in the ERAs over 60 months for Matrix Devices far exceeded their true market value.

139.    Norvergence required that all of its customers enter into the ERA together with the agreement to provide services, and refused to allow any customer to procure and make use of its own Adtran device in connection with the Norvergence Matrix Solution.

140.    Norvergence refused to offer to sell the Matrix Boxes.

141.    The ERA, which appeared to be an agreement for the rental of a Matrix Device, was, in reality, nothing more than a mechanism whereby the payments for telecommunication services, which were never expected or intended to be provided, were converted into marketable commercial paper.

142. This transformation of the payment for services into a payment for equipment permitted the conversion of future cash flow into present income.

143. Because of the aforementioned deceptive and unfair practices, Norvergence deceitfully and fraudulently induced Townsend to contract with it for the purported provision of telecommunication services.

144. Norvergence materially misrepresented to Townsend that the Matrix Devices were necessary to allow them to obtain the savings as promised by Norvergence.

145. The Matrix Devices, however, are wholly unrelated to the promised savings, as set forth in greater detail above.

146. Notwithstanding the fact that the Matrix Devices are not necessary, Norvergence grossly over-inflated the rental price of each piece of equipment.

147. Townsend relied upon the foregoing representations made by Norvergence when they signed ERAs and all other documents relating to the transaction.

148. The representations were material to their decision to proceed with the transaction.

149. The grossly inflated rental agreements thereafter were assigned and/or sold to Defendants.

150. Defendants, in contrast to Townsend, had expertise in equipment financing and had ready access to data regarding the gross disparity between the value of the equipment and the payment stream under the ERA.

151. As a direct and proximate result of their reliance upon the misrepresentations averred above, Townsend has suffered monetary damages.

152.   As the product of Norvergence's fraudulent scheme, the ERAs and associated guarantees were void *ab initio*.

153.   Defendants may not collect upon these fraudulent instruments.

WHEREFORE, Townsend respectfully requests that the Court:

a.   enter judgment in its favor on this Count;

b.   declare the ERAs void and unenforceable;

c.   award Townsend damages, including treble damages as against American National and Norvergence;

d.   award Townsend attorneys' fees, filing fees and the costs of prosecuting this action as against American National and Norvergence; and

e.   award Townsend the costs of defending any action brought to enforce the ERA, including counsel fees as against American National and Norvergence; and

f.   award Townsend such other equitable relief as deemed appropriate by the Court.

## COUNT V

### Unconscionability Under the New Jersey Consumer Fraud Act

154.   Townsend incorporates by reference the preceding paragraphs as if same were set forth at length herein.

155.   The ERAs and accompanying documents were non-negotiable contracts of adhesion, which were procured by Norvergence without good faith, fair dealing and honesty in fact.

156.    Norvergence engaged in procedurally unconscionable practices which misled Townsend and robbed it of meaningful choice, including but not limited to the following:

a.    Advertising that it could provide Townsend with substantially discounted communication services;

b.    Requiring that Townsend execute an ERA in connection with a separate telecommunications service agreement as a condition to obtaining discounted telecommunication services from Norvergence;

c.    Refusing to allow any customer to purchase or make use of its own Matrix Device in connection with the purported services to be provided by Norvergence;

d.    Refusing to sell the Matrix Box outright to Townsend;

e.    Refusing to alter, modify, change, amend, or adjust the ERA;

f.    Threatening to terminate the sale if the customer attempted to read the paperwork, asked about the details of the agreement, inquired about Norvergence's financial condition, sought clarification on the ERA, made inquiries about the functionality of the Matrix Device, or asked what would happen if Norvergence went out of business.

g.    Representing that the documents Townsend was required to sign, including the ERA, were merely "non-binding" applications;

h.    Requiring customers, including Townsend, to sign and/or fill out documents in blank, such as a Credit Application, a Non-Binding Hardware and Software Services Application, a Facilities Information Marketing Worksheet, a

Qwest PIC Letter of Authorization, a Qwest Toll Free Service form, and burying the ERA in the middle of these documents;

    i.    Failing to disclose to its customers that the "non-binding" documents, particularly the ERA, purportedly became a binding, sixty-month obligation upon the delivery of the Matrix Device;

    j.    Falsely advertising that the Matrix Devices had propriety technology created by Nortel;

    k.    Representing that the Matrix Device "removed" all per minute charges from both cellular and landline calls;

    l.    Utilizing the company trademarks of Nortel Networks, Sun Microsystems, Qwest Communications, and/or other established companies to create a veil of credibility with Townsend;

    m.    Claiming that there was a high demand for its services, to create an air of supremacy in the telecommunications market; and

    n.    Claiming that only a "select few" applicants were allowed to utilize its services.

157.    In addition, Norvergence required Townsend to execute ERAs and related documents that were substantively unconscionable because of unreasonably oppressive and disproportionate terms, including, but not limited to:

    a.    a payment stream which was up to hundreds of times the reasonable market value for each Matrix Device;

    b.    a "floating" choice of forum clause;

    c.    a "floating" choice of law clause;

d.      a clause that purports to waive a trial by jury in any way relating to the rental agreement, without making it conspicuous, noticeable, or prominent in any way;

e.      a ban on the selling, pledging, transferring, or assigning the ERA by the Rentee, but unilaterally purporting to allow the Rentor (i.e., Norvergence) to do so without notifying the Plaintiff of such action;

f.      a waiver of warranties, express or implied, including a waiver of merchantability or fitness for a particular purpose;

g.      a waiver of the customer's right to cancel or repudiate the ERA, reject or revoke the equipment (i.e., Matrix Devices), grant a security interest in the equipment, accept partial delivery of the equipment, purchase or rent substitute equipment, or seek specific performance;

h.      the taxing of each customer on the grossly inflated value of the Matrix Device rather than on its actual market value;

i.      a requirement that each customer insure the Matrix Device for its grossly inflated value, rather than on its actual market value;

j.      a clause that purports to make payment under the ERA unconditional, despite equipment failure, loss or other problem.

k.      a clause that requires the customer to make any claim relating to the equipment's non-functionality to the supplier or manufacturer, but not against Norvergence even though Norvergence supplied the equipment;

l.      the absence of a provision identifying the manufacturer;

m.    a clause that purports to make the ERA an "Article 2A Finance Lease."

158.    Norvergence's foregoing actions constitute unconscionable commercial practices in connection with the sale and/or advertising of merchandise in violation of N.J.S.A. 56:8-2.

159.    Despite the patently unconscionable nature of the ERAs and related documents, Defendants took an assignment of the ERAs and have received and pursued payment from Townsend under the terms of the ERAs.

160.    Despite knowledge of these unconscionable practices, Defendants continue to collect and pursue payments under the ERAs from Townsend in violation of N.J.S.A. 56:8-2.

161.    As a direct and proximate result of these unconscionable practices, Townsend has suffered damages.

WHEREFORE, Townsend respectfully requests that the Court:

a.    enter judgment in their favor on this Count;

b.    declare the ERAs to be unconscionable and therefore void and unenforceable;

c.    award Townsend treble damages as against American National and Norvergence;

d.    award to Townsend and against American National and Norvergence attorneys' fees, filing fees and the costs of prosecuting this action; and

e.    award to Townsend and against American National and Norvergence the costs of defending any action brought to enforce the ERA, including counsel fees; and

f.      award to Townsend and against American National and
Norvergence such other equitable relief as deemed appropriate by
the Court.

## COUNT VI

### Unjust Enrichment

162.    Townsend incorporates by reference the preceding paragraphs as if same were set forth at length herein.

163.    By virtue of the actions and inactions described in the foregoing paragraphs of this Complaint, Defendants and Norvergence have been and would continue to be unjustly enriched in an amount equal to the payments already made and to be made as required by the ERAs because such payments arise from the purported lease of equipment which does not perform the represented function and which the Norvergence and Defendants knew or should have known was fraudulently, knowingly and unjustifiably represented as performing a technological service integral to receiving the services to be provided by Norvergence.

164.    Norvergence and Preferred Capital's actions in inducing Townsend to contract for and to rent the Matrix Devices, which Norvergence and Preferred Capital knew or should have known were fraudulent, is outrageous and unconscionable conduct.

WHEREFORE, Plaintiff respectfully request that the Court:

a.      enter judgment in their favor on this Count;

b.      award to Plaintiff and against American National and Norvergence
damages plus interest from the date the first payments were made
by each Plaintiff;

c.      award to Plaintiff and against American National and Norvergence
the costs of prosecuting this action, including counsel fees;

d.    award to Plaintiff and against American National and Norvergence the costs of defending any action brought to enforce the ERA, including counsel fees;

e.    award to Plaintiff punitive damages as against Norvergence; and

f.    award to Plaintiff and against the Defendants such other equitable relief as deemed appropriate by the Court.

## COUNT VII

### Debts or Obligations Fraudulently
### Contracted or Incurred Pursuant to N.J.S.A. 2A:32-1

165.    Townsend incorporates by reference the preceding paragraphs as if same were set forth at length herein.

166.    Norvergence represented to Townsend that it would provide certain services at substantial savings over the prices charged by other providers of said services.

167.    Norvergence further represented to Townsend that in order to obtain the savings so represented, Townsend were required to rent a Matrix Device, which contained special technology that made such savings possible.

168.    Norvergence represented that the Matrix Devices were of special and significant value, when in fact the Matrix Devices were ordinary routers of minimal value.

169.    Such fraudulent representations were made by Norvergence in order to induce Townsend to execute the ERAs to rent the Matrix Devices.

170.    The Matrix Devices provided by Norvergence as consideration for the execution of such ERAs was fraudulent and inadequate.

WHEREFORE, Townsend respectfully requests that the Court:

a.    enter judgment in their favor on this Count;

360018-1                                    32

b.    declare the ERAs rescinded;

c.    award to Plaintiff and against American National and Norvergence damages plus interest from the date of the first payment made pursuant to each ERA;

d.    award to Plaintiff and against American National and Norvergence the costs of prosecuting this action, including counsel fees;

e.    award Townsend and against American National and Norvergence the costs of defending any action brought to enforce the ERA, including counsel fees; and

f.    award to Plaintiff and against Norvergence punitive damages; and

g.    award to Plaintiff and against the Defendants and Norvergence such other equitable relief as deemed appropriate by the Court.

## COUNT VIII

### Disallowance of Claims Pursuant to Bankruptcy Code §502(b)(1)

171.   Townsend incorporates by reference the preceding paragraphs as if same were set forth at length herein.

172.   Defendants, by virtue of the agreements that they entered into with Norvergence or its assignees for the purchase and/or assignment of all of Norvergence's rights, title and interest in the ERAs entered into with Townsend, have contractual right of recourse to Norvergence for damages due to breaches or non-payment of the ERAs by Townsend ("Recourse Claims").

173.   Defendants' potential rights to payments for Recourse Claims arise out of the unlawful and legally unenforceable ERAs that were the means and instrumentalities of Norvergence's fraudulent scheme in concert and with the assistance of Preferred Capital.

360018-1                                    33

174.   Defendants' Recourse Claims, if and when asserted, or filed by Defendants in the Norvergence Case, are unsecured claims.

175.   Defendants' Recourse Claims are not entitled to merely the amount of the Discounted Payments but could include claims for amounts representing anticipated profit of the Defendants and costs and expenses incurred by the Defendants.

176.   Defendants' Recourse Claims are objected to by Townsend as unenforceable against Norvergence and Norvergence's estate, under applicable law as set forth herein and as a matter of equity that a participant in a fraud may not make claim for damages arising from the fraudulent scheme against another participant.

177.   Pursuant to Bankruptcy Code §502(b)(1) Defendants' Recourse Claims must be disallowed.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order disallowing any claim asserted or to be filed by any of the Defendants arising out of Defendants' recourse claims for damages regarding the ERAs.


**COUNT IX**

**Equitable Subordination pursuant to Bankruptcy Code §510(c)**

178.   Plaintiff incorporates by reference the preceding paragraphs as if same were set forth at length herein.

179.   Preferred Capital's actions and conduct in concert with Norvergence, in aiding and abetting Norvergence's fraudulent scheme and in serving as the means and

instrumentality by which Norvergence perpetrated the fraudulent scheme, constituted inequitable conduct by defrauding Townsend to its detriment and to the detriment of other creditors of Norvergence.

180.    Preferred Capital's actions and conduct as fully described hereinabove was and continues to be unlawful, shocks one's conscience, was and continues to be unfair to Townsend as creditors of the Norvergence Case and was and continues to be an aiding and abetting of the breach of Norvergence's duties to its creditors.

181.    Defendants' actions and conduct in purchasing or taking assignments of the ERAs and attempting to enforce and collect from Townsend the monthly payments called for under the ERA even after Norvergence's fraudulent scheme has been openly displayed and all service and benefits to Townsend have ceased is an inequitable attempt to shift to Townsend the "losses" incurred by Defendants from their own actions and conduct in aid of Norvergence's fraudulent scheme.

182.    In addition, at the time of Preferred Capital's continued inequitable conduct and acts, Norvergence was insolvent and thus owed a fiduciary duty to Norvergence's unsecured creditors, including Townsend.

183.    Defendants' inequitable and wrongful actions and conduct in threatening Townsend to collect and enforce the ERA in continuation of Norvergence's fraudulent scheme was intended to give Defendants an unfair advantage over other creditors of the Norvergence estate vis-à-vis Defendants' potential Recourse Claims to claims for damages by Townsend.

184.    Defendants' potential Recourse Claims would be inequitable and injurious to the other creditors of Norvergence in that such claims originated from Norvergence's

fraudulent scheme and are for an amount in excess of the amounts of the Discounted Payments.

185.    Preferred Capital had a close business relationship with Norvergence and aided and abetted Norvergence's fraudulent scheme and was the means and instrumentality of its fraud and as such is subject to special and close scrutiny of its actions and conduct.

186.    Townsend did not have a close relationship with Norvergence, is not a sophisticated financing institution, nor was it aware of the fraudulent scheme being perpetrated upon it by Norvergence with the aid and cooperation of Preferred Capital.

187.    All of Defendants' inequitable actions and conduct would serve to enrich Defendants if Defendants are able to assert Recourse Claims against the Norvergence estate at the same priority as Townsend.

188.    Further, if Defendants are permitted to continue to collect and enforce the ERAs against Townsend, Defendants will continue to reduce its Recourse Claims while Townsend's unsecured claim will increase.

189.    By reason of the foregoing, Townsend and other unsecured creditors of Norvergence were harmed by Defendant's actions and conduct, and will suffer further harm if Defendant's Recourse Claim is allowed at the same priority as all general unsecured claims, which would be unfair and inequitable.

190.    Equitable subordination of Defendants' claims to the lowest priority of claims below that of unsecured creditors and late filed unsecured claims is consistent with the Bankruptcy Code.

360018-1                              36

WHEREFORE, Townsend respectfully requests that this Court enter an order equitably subordinating any claims filed by Defendants to the lowest priority below all unsecured claims and late filed unsecured claims pursuant to Bankruptcy Code §510(c).

## COUNT X

### Claims against Norvergence's Estate
### Pursuant to Bankruptcy Code §§501 & 502

191.    Townsend incorporates by reference the preceding paragraphs as if same were set forth at length herein.

192.    Townsend asserts unsecured claims for the right to payment against the Norvergence estate for damages arising out of the fraudulent scheme perpetrated upon it by Norvergence arising out of the ERA which it signed.    Townsend's claim is for amounts in excess of $73,000 paid to American National and in excess of $45,000 paid to Preferred Capital.

193.    The claims for damages herein asserted are based upon damages for fraudulently inducing Plaintiff to enter into and execute the ERA as well as unliquidated damages for loss of bargain, breach of contract for telecommunications services, tortious conduct by Norvergence, legal fees and costs incurred, all of which are subject to future amendment.

194.    The claims were incurred on the date of the execution of the respective ERA by Norvergence and Townsend.

195.    No judgment has been entered in favor of Townsend for the amount claimed herein.

196.   The amount claimed by Townsend has not been discounted to present value but represents the full amount owed by the respective Plaintiff under the respective ERA.

WHEREFORE, Townsend requests that this Court enter an order allowing its unsecured claims in the amounts set forth above, subject to future amendment, pursuant to Bankruptcy Code §§501 and 502.

WEIR & PARTNERS LLP

By:   /s/ Marc J. Zucker

Marc J. Zucker, Esq. (MZ 7768)
Susan Verbonitz, Esq. (SV 2487)
The Liberty View Building
Suite 310
457 Haddonfield Road
Cherry Hill, NJ 08002
(856) 740-1490 (telephone)
(856) 740-1491 (facsimile)
Attorneys for Plaintiff

Of counsel:

ROBERT D. GREENBAUM & ASSOCIATES, LLC
ROBERT D. GREENBAUM
PA Identification No. 44336
The Widener Bldg., Suite 530
1339 Chestnut Street
Philadelphia, PA  19107
(215) 568-9802 (telephone)
(215) 568-9803 (facsimile)

Date: June 29, 2010